United States District Court
Southern District of Texas
**ENTERED**
May 24, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DR. JOSEPH URA, | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 4:23-cv-2934 |
| V. | § | |
| TEXAS A&M UNIVERSITY, | § | |
| *Defendant.* | § | |

# ORDER

This is an employment retaliation suit arising from alleged retaliation against Plaintiff Dr. Joseph Ura ("Plaintiff" or "Dr. Ura") by Defendant Texas A&M University. ("Defendant" or "TAMU"). Pending before the Court is Defendant's Partial Motion to Dismiss regarding Plaintiff's claims under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). (Doc. No. 9). Dr. Ura filed a response. (Doc No. 13). TAMU replied. (Doc. No. 14). The Court hereby **GRANTS** Defendant's Motion to Dismiss. (Doc. No. 9).

## I. Background

Dr. Ura joined TAMU as Assistant Professor of Political Science in 2007. (Doc. No. 1 at 3). He was promoted to Associate Professor with tenure in 2013 and began an appointment with Texas A&M University Qatar Campus ("TAMU-Q") in 2019. (Doc. No. 1 at 3). TAMU-Q is principally funded by the Qatar Foundation, an educational and philanthropic organization funded by the State of Qatar. (Doc. No. 1 at 3). On January 1, 2020, Dr. Ura became the Interim Liberal Arts Program Chair for TAMU-Q. His four-year appointment became fully effective on September 1, 2021. (Doc. No. 1 at 4). Dr. Ura recruited Dr. Sheela Athreya ("Dr. Athreya"), an Associate

Professor of Anthropology with tenure at TAMU, to the faculty of TAMU-Q for a two-year appointment beginning in 2020. (Doc. No. 1 at 4).

The contract between TAMU and the Qatar Foundation requires the school to make its best effort to recruit faculty from the TAMU's primary campus in College Station, Texas, with the target of staffing half of TAMU-Q's faculty positions with faculty from TAMU's College Station campus. TAMU-Q faculty positions for tenured faculty from the main campus are renewable by the Dean of TAMU-Q, Dr. Cesar Malavé ("Dean Malavé"). (Doc. No. 1 at 4). Prior to the incidents of this case, no professor who requested an extended appointment at TAMU-Q with the support of their home department had ever been denied a renewal. (Doc. No. 1 at 5).

In June 2021, Dr. Ura spoke with the Head of the Department of Anthropology and the Dean of the College of Liberal Arts, Dr. Athreya's home departments. They unanimously supported extending Dr. Athreya's appointment at TAMU-Q. (Doc. No. 1 at 5). On August 12, 2021, Dr. Ura requested that Dean Malavé renew Dr. Athreya's contract for two years. (Doc. No. 1 at 5). Dean Malavé refused. (Doc. No. 1 at 5). At this time, Dr. Ura began to suspect that Dean Malavé's justification and action may be connected to the absence of women among the senior faculty of TAMU-Q. (Doc. No. 1 at 5).

On September 1, 2021, Dr. Ura requested that Dean Malavé renew the contract again, and Dean Malavé refused again. (Doc. No. 1 at 5). At this same meeting, Dean Malavé instructed Dr. Ura to issue a non-renewal notice to Dr. Brittany Bounds ("Dr. Bounds"). Dr. Bounds was an Instructional Assistant Professor of History at TAMU-Q and co-chair of the TAMU-Q Women's Faculty Forum, a professional organization that advocates for greater inclusion of women in campus leadership roles and stronger efforts to recruit women to TAMU-Q's Faculty. (Doc. No. 1

at 5). Dr. Bounds is also a veteran of the United States Air Force and was the subject of a controversy in May of 2021 regarding her posts on Twitter supporting Israel's territorial integrity.

Around this time, Dean Malavé received complaints about Dr. Bounds from the TAMU-Q Student Association President and a senior leader of the Qatar Foundation, who Plaintiff claims pressured Dean Malavé "to get rid of Dr. Bounds because of her views *and* her military status." (Emphasis orig.) (Doc. No. 1 at 6). In the summer of 2021, TAMU and the Qatar Foundation were completing negotiations on a new ten-year agreement to continue operations of the TAMU-Q campus. Failure to secure an agreement with the Qatar Foundation would lead to the closure of TAMU-Q and the loss of hundreds of millions of dollars in additional funding for TAMU. (Doc. No. 1 at 7). Dean Malavé's actions against Dr. Athreya and Dr. Bounds contributed to Dr. Ura's suspicion that Dean Malavé was discriminating against these faculty because of their sex. (Doc. No. 1 at 7). Dr. Ura also believed Dean Malavé was discriminating against Dr. Bounds because of her status as a military veteran and in retaliation for her protected public speech, which, if true, would violate USERRA.

On September 13, 2021, Dr. Ura discussed these suspicions over videoconference with Dr. Ioannis Economou ("Dr. Economou"), the Associate Dean for Academic Affairs at TAMU-Q at the time, and Mr. Mario Rojo del Busto, the Associate Dean for Faculties at TAMU. (Doc. No. 1 at 7). At the meeting, Mr. Rojo del Busto indicated that Dean Malavé was pursuing Dr. Bounds' removal because of student complaints against her for her public comments and prior military service. (Doc. No. 1 at 7). Dr. Ura told Mr. Rojo del Busto and Dr. Economou that he would not issue a non-renewal notice to Dr. Bounds until he had investigated the complaints against her. (Doc. No. 1 at 7). Dr. Economou reported Dr. Ura's actions to Dean Malavé. (Doc. No. 1 at 7).

Dr. Ura refused to issue a notice of non-renewal to Dr. Bounds, insisting on an inquiry into the student complaints.

TAMU policies require all faculty to promptly report allegations of sex discrimination to designated civil rights officials. (Doc. No. 1 at 8). On September 16, 2021, Dr. Ura discussed his concerns with the then-Dean of Faculties, Dr. Blanca Lupiani ("Dr. Lupiani"). (Doc. No. 1 at 9). Dr. Ura stated in this meeting that he believed Dean Malavé was discriminating against Dr. Athreya and Dr. Bounds based on their sex and against Dr. Bounds due to her veteran status. At the meeting Dr. Lupiani discussed concerns by the prior Arts Program Chair about potential discrimination by Dean Malavé. (Doc. No. 1 at 9). Dr. Ura gave permission for Dr. Lupiani to discuss his concerns directly with Dean Malavé. (Doc. No. 1 at 9). Six days later, Dr. Lupiani left her position as Dean of Faculties. (Doc. No. 1 at 9).

On September 27, 2021, Dr. Ura reported his beliefs of Dean Malavé's discrimination to the TAMU Office of Ethics and Compliance (Doc. No. 1 at 9). In late September or early October, Dean Malavé traveled to College Station for meetings with senior university leaders. (Doc. No. 1 at 10). In his April 22, 2022, interview with TAMU civil rights investigators, Dean Malavé stated he "made up his mind [to dismiss Dr. Ura] in one of his trips, my last trip [to College Station in October 2021]." (Doc. No. 1 at 10).

On October 18, 2021, Dean Malavé summoned Dr. Ura to his office and expressed that he wanted Dr. Ura to resign as Program Chair (Doc. No. 1 at 11). When seeking more details for the reason of this request, Dean Malavé identified three complaints of Dr. Ura: (1) that Dr. Ura had insisted on assigning teachers their normal course load unless they received extra compensation for additional classes; (2) that Dr. Ura asked the Dean of Faculties about the scope of Dean

4

Malavé's ability to assign course load; and (3) "starting the investigation with Brittany [Bounds]". (Doc. No. 1 at 12). Dr. Ura refused to resign, and Dean Malavé removed him on October 19, 2021.

Plaintiff asserts claims of retaliation under Title VII of the Civil Rights Act and USERRA. Regarding the USERRA claims, Plaintiff argues that he was retaliated against for engaging in protected activity by refusing to administer the non-renewal of Dr. Bounds's contract, due to the rights afforded to her because of her veteran-status; reporting Dean Malavé for attempting to deny the renewal of Dr. Bounds's contract; and participating in an investigation regarding potential USERRA violations with respect to Dr. Bounds.

Defendant moves to dismiss Plaintiff's USERRA retaliation claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.     Legal Standard

Federal district courts are courts of limited jurisdiction; thus, unless proven otherwise, it is presumed that the case is outside the scope of a district court's jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a federal court's subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). A court must dismiss a complaint if it lacks subject matter jurisdiction. *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012). A plaintiff always has the burden to show jurisdiction exists. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted). A court may dismiss a claim for lack of subject matter jurisdiction based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

### III. Analysis

The sole issue presented in the motion is whether this Court has subject matter jurisdiction to hear a private individual's USERRA claims against States as employers, or whether State sovereign immunity bars adjudication of these claims. Given the Supreme Court's ruling in *Torres v. Texas Dep't of Public Safety*, which held that States waived their sovereign immunity in USERRA claims as part of the "plan of the Convention," this Court finds that it has subject matter jurisdiction to adjudicate Plaintiff's claims pursuant to the jurisdictional grant in 28 U.S.C § 1331.

#### A. <u>USERRA</u>

USERRA is "a federal law that protects employees from being discriminated against by their employers because of their military service." *McIntosh v. Partridge*, 540 F.3d 315, 320 (5th Cir. 2008) (citing 38 U.S.C. § 4311). Congress enacted USERRA as an exercise of its power "[t]o raise and support Armies" and "[t]o provide and maintain a Navy." U. S. Const., Art. I, § 8, cls. 12–13. USERRA's operative text lays out three separate types of claims and identifies which courts have jurisdiction over those claims:

> (1) In the case of an action against a State (as an employer) or a private employer commenced by the United States, the district courts of the United States shall have jurisdiction over the action.
>
> (2) In the case of an action against a State (as an employer) by a person, **the action may be brought in a State court** of competent jurisdiction in accordance with the laws of the State.
>
> (3) In the case of an action against a private employer by a person, the district courts of the United States shall have jurisdiction of the action.

38 U.S.C. § 4323(b) (emphasis added). Here, Plaintiff's cause of action against Defendant undoubtedly falls into subsection (2) because Plaintiff is a person bringing suit against the State of Texas as an employer. Thus, the question before the Court is whether subsection (2) mandates that State courts are the exclusive forum for adjudicating these types of claims, thus depriving this

Court of subject matter jurisdiction. At first glance, the use of the term "may" instead of "must" might suggest that bringing the suit in state court is *permitted* but not *required*. This question, however, cannot be answered by simply looking at the text. Instead, in answering this question, the Court must examine the somewhat complicated body of law regarding States' sovereign immunity.

### B. *Sovereign Immunity*

The Supreme Court has "made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting states." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). In general, such suits are barred by the States' sovereign immunity. For claims to be barred by sovereign immunity, "the state need not be the named party in a federal lawsuit, for a state's Eleventh Amendment immunity extends to any state agency or entity deemed an 'alter ego' or 'arm' of the state." *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002) (citing *Vogt v. Bd. of Commissioners of the Orleans Levee District*, 294 F3d 684, 688–89 (5th Cir. 2002)).

Importantly, sovereign immunity only bars claims "absent waiver by the State or valid congressional override." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). This congressional override is referred to as abrogation. For Congress to abrogate the States' sovereign immunity, Congress's intent to abrogate must be obvious from "a clear legislative statement" and the legislation must have been passed "pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55-58 (1996) (citing *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 786 (1991), and *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

In determining the first requirement—congressional intent—the Supreme Court has stated the following:

> To temper Congress' acknowledged powers of abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional

structure, we have applied a simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'

*Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).

In determining the second requirement—valid exercise of power—the Supreme Court has provided two key guardrails. At the risk of oversimplifying, Congress generally may abrogate sovereign immunity pursuant to its Fourteenth Amendment powers. *See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–456 (1976) (recognizing that, by expanding federal power at the expense of state autonomy, the Fourteenth Amendment had fundamentally altered the balance of state and federal power struck by the Constitution). Congress may not, however, abrogate sovereign immunity pursuant to its powers under Article I of the Constitution. *See Seminole Tribe*, 517 U.S. 44, 73 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction. Petitioner's suit against the State of Florida must be dismissed for a lack of jurisdiction."). It is with this background in mind that the Court turns to the specific overlap between sovereign immunity and USERRA.

C. *McIntosh v. Partridge*, 540 F.3d 315 (5th Cir. 2008)

The Court's examination begins with *McIntosh v. Partridge*, 540 F.3d 315 (5th Cir. 2008). In *McIntosh*, the Fifth Circuit held that federal courts lacked subject matter jurisdiction to hear USERRA claims brought under subsection (b)(2) because Congress had not affirmatively and clearly granted jurisdiction to federal courts to abrogate State sovereign immunity. The Circuit reversed the district court, which had ruled that a USERRA claim could be brought in either state or federal court. The district court had reasoned that, "since the statute provides that suits by

8

individuals against a state '**may**,' rather than '**must**,' be brought in state court, Congress was not restricting jurisdiction to state courts." *McIntosh*, 540 F.3d at 320 (emphasis added).

In reversing, the Circuit concluded that the district court had not applied the proper standard for determining abrogation of sovereign immunity. In order for Congress to abrogate States' sovereign immunity, "Congress must affirmatively and clearly grant jurisdiction to federal courts." *Id.* at 321 (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985)). Indeed, under precedent set by *Atascadero*, Congress can abrogate the States' sovereign immunity "only by making its intention unmistakably clear in the language of the statute." *Atascadero*, 473 U.S. 234 (1985). Therefore, relying on the available precedent regarding abrogation, the Fifth Circuit found that USERRA's text did not demonstrate an unmistakably clear intention to abrogate State sovereign immunity by allowing individuals to bring USERRA claims against States as employers in federal court. *McIntosh*, 540 F.3d at 321. As such, the Circuit concluded that federal courts do not have jurisdiction to hear individual's USERRA claims against States as employers.[1]

The Fifth Circuit supported this interpretation by comparing the current version of the statute with its prior version. In the prior version of the statute, subsection (b) read "in the case of an action against a State as an employer, the appropriate district court is the court for any district in which the State exercises any authority or carries out any function." The Fifth Circuit reasoned that, in restyling subsection (b) in the current version, Congress removed the blanket grant of jurisdiction to federal courts over all USERRA claims, replacing the broad jurisdictional grant with a provision that only mentions the ability of individuals to bring claims against States as employers

---

[1] Finding a lack of clear congressional intent, the Fifth Circuit did not address the second requirement for abrogation—whether USERRA was passed under a valid exercise of power. Had the Court reached this question, it would presumably have found that Congress could not abrogate sovereign immunity pursuant to its Article I military powers after *Seminole Tribe*. Thus, it would have reaffirmed its interpretation that federal courts lack jurisdiction to hear individual USERRA claims against States because those claims were barred by sovereign immunity.

in state court. Therefore, Congress did not demonstrate an intent to allow States to be sued in federal court.

This holding was in line with other circuits at the time. *See Wood v. Florida Atlantic Univ. Bd. of Trustees*, 432 F. App'x 812, 815 (11th Cir. 2011) ("The text of USERRA has been interpreted to mean that jurisdiction to entertain private USERRA suits against state employers lies exclusively in state court."); *Velasquez v. Frapwell*, 165 F.3d 593 (7th Cir. 1999) (holding, "Congress's intention to limit USERRA suits against states to state courts is unmistakable"); *Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008) ("[W]e conclude that the district court correctly dismissed Townsend's suit against the State for lack of subject matter jurisdiction"). Thus, circuit courts and district courts across the country seemed to be in agreement that despite the use of "may" in § 4323(b), jurisdiction lies exclusively with state courts due to Congress's failure to abrogate State sovereign immunity.

D. *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580 (2022)

In 2022, the Supreme Court issued its opinion in *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580 (2022). In *Torres*, the Supreme Court held that in the context of § 4323 USERRA claims, States are not entitled to sovereign immunity from suit. Importantly, the *reason* that States are not entitled to sovereign immunity is not because Congress abrogated it, but because States consented to be sued pursuant to the "plan of the Convention." In finding that the States implicitly consented to be sued pursuant to the "plan of the Convention," the *Torres* Court relied heavily on its decision in *PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482 (2021).

In *PennEast*, the Supreme Court articulated a somewhat new theory for how Congress could create a private right of action against nonconsenting States—the "plan of the Convention," or structural waiver. *Id. PennEast* defined this test for structural waiver as whether the federal

power at issue is "complete in itself, and the States consented to the exercise of that power—in its entirety—in the plan of the Convention." *Id.* at 508. Where that is the case, the States implicitly agreed that their sovereignty would "yield to that of the Federal Government 'so far as is necessary to the enjoyment of the powers conferred upon it by the Constitution." *Id.* at 502 (internal citations omitted).

The *PennEast* Court made it clear that subjecting States to suit by way of the plan-of-the-Convention is distinct from subjecting States to suit by way of Congressional abrogation. It reasoned that "congressional abrogation is not the only means of subjecting States to suit." *Id.* at 500. Where the States agreed in the plan of the Convention to not assert any sovereign immunity defense, no congressional abrogation is needed to abrogate the States' sovereign immunity. *Id.* The States simply "have no immunity left to waive or abrogate." *Id.* at 508.

Relying on *PennEast*, the *Torres* Court held that the Congress' power to build and maintain a national military—the power underpinning USERRA—is complete in itself. *Torres*, 597 U.S. at 594. The Court found that "[t]ext, history, and precedent show the States agreed that their sovereignty would 'yield ... so far as is necessary' to national policy to raise and maintain the military." *Id.* In doing so, the Court rejected Texas's argument that Congress cannot abrogate State sovereign immunity through exercise of Article I powers. The Court reinforced the distinction between abrogation and plan-of-the-Convention waiver.[2] Since the federal government's power to raise and maintain military forces passes the *PennEast* test, it is States' implicit consent in the plan of the Convention that allows Congress to subject them to USERRA claims. It follows, then, that any discussion of abrogation is irrelevant.

---

[2] "That said, the line between 'plan-of-the-Convention waiver' and 'congressional abrogation' is a murky one." *Torres*, 597 U.S. at 604 (Thomas J., dissenting).

E. *Whether This Court Has Jurisdiction*

How, if at all, does the Supreme Court's holding in *Torres* affect our reading of *McIntosh*? Does *McIntosh* still require that this Court dismiss Plaintiff's USERRA claim for lack of subject matter jurisdiction? That is the question before the Court, and it is a question that the Fifth Circuit has yet to address.

In its motion to dismiss, Defendant argues that *Torres* does not affect *McIntosh*'s holding that federal courts lack jurisdiction to adjudicate private individuals' USERRA claims against States as employers. It argues that "*Torres* did not overrule the binding precedent in *McIntosh*" because *Torres* involved a suit brought originally in state court. (Doc. No. 9 at 7). Defendant also points to dicta in the *Torres* opinion that states "Congress' clarification that suits proceed 'in a State court of competent jurisdiction in accordance with the laws of the State' merely addresses the fact that USERRA suits must be brought in state (rather than federal) court." *Torres*, 597 U.S. at 595 (citing 38 U.S.C. § 4323(b)) (emphasis added). Finally, even if there were ambiguity regarding jurisdiction, Defendant argues that the Court should strictly construe the statute against Plaintiff to avoid constitutional questions and overstepping jurisdiction. (Doc. No. 14). Thus, Defendant urges the Court to dismiss Plaintiff's claim for lack of subject matter jurisdiction.

By contrast, Plaintiff argues that dismissal is no longer required under *McIntosh* because federal courts have jurisdiction over individual USERRA claims against States after *Torres*. As noted above, *Torres* held that there is not, and never has been, State sovereign immunity for USERRA claims. (Doc. No. 13). Plaintiff therefore contends that, "Defendant's cited authority generally suffers from that same issue because it discusses whether there has been an abrogation of immunity, but under *Torres*, there is no immunity at all to abrogate." In other words, since *McIntosh* predates *Torres*, and since *Torres* found that the States never had sovereign immunity to

12

begin with, *McIntosh*'s reasoning based on abrogation is moot. In light of *Torres*, Plaintiff argues that the relevant question is not whether Congress has abrogated State sovereign immunity (the question that *McIntosh* addressed), but whether Congress has given state courts exclusive jurisdiction over federal USERRA claims. In Plaintiff's view, holding that USERRA gives exclusive jurisdiction to state courts runs counter to both the plain language of the statute and the Supreme Court's decision in *Mims v. Arrow Financial Services, LLC*. In *Mims*, the Supreme Court held that statutory language stating that actions "may" be brought in state court does not convey exclusive jurisdiction on state courts. 565 U.S. 368 (2012). Finally, Plaintiff argues that Defendant's reliance on *Torres* dicta is misplaced, as that comment was made in the context of responding to an argument made by Justice Thomas in dissent, but never actually raised by any parties.

Upon examining the briefings and case law discussed above, the Court finds that it would be inappropriate to exercise jurisdiction over Plaintiff's USERRA claim. The Court is bound by the prevailing Fifth Circuit and Supreme Court precedent. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787 (5th Cir. 2021) ("The district court was not free to overturn the rule we announced in *Eckstein*. Because subsequent Supreme Court decisions have effected an intervening change in the law that warrants a change in course, we overturn the *Eckstein* rule today and REVERSE the district court's adept decision accordingly."). The Court is ultimately unpersuaded by Plaintiff's arguments that it can depart from this binding precedent.

"For a Supreme Court decision to override a Fifth Circuit case, the decision must unequivocally overrule prior precedent; mere illumination of a case is insufficient." *Gahagan v. U.S. Citizenship & Immigration Services*, 911 F.3d 298, 302 (5th Cir. 2018) (quoting *United States v. Petras*, 879 F.3d 155, 164 (5th Cir. 2018)). Fifth Circuit precedent is implicitly overruled only

if a subsequent Supreme Court opinion "establishes a rule of law inconsistent with" that precedent. *Gonzalez v. Thaler*, 623 F.3d 222, 226 (5th Cir. 2010).

That is not the case here. Rather, in *Torres*, the Supreme Court implicitly approved of the ruling in *McIntosh* that federal courts lack jurisdiction, even if that approval was in dicta. *Torres*, 597 U.S. at 595 ("Congress' clarification that suits proceed 'in a State court of competent jurisdiction in accordance with the laws of the State' <u>merely addresses the fact that USERRA suits must be brought in state (rather than federal) court</u>.") (citing 38 U.S.C. § 4323(b)) (emphasis added). Thus, the Court cannot find that *Torres* overruled, or is otherwise so inconsistent with, the Fifth Circuit's binding holding in *McIntosh*. Just the opposite—it has written that USERRA suits must be filed in state courts. Therefore, in accordance with *McIntosh* and *Torres*, the Court must dismiss Plaintiff's claims under USERRA because federal courts lack jurisdiction to hear suits by individuals against States as employers.[3] The Court therefore GRANTS Defendant's Partial Motion to Dismiss. (Doc. No. 9).

The Court understands Plaintiff's difficulty in squaring *McIntosh*'s holding with *Torres*. In *McIntosh*, the Fifth Circuit *assumed* that States were afforded sovereign immunity against USERRA claims. This was a sound assumption given precedent at the time. The Circuit relied on this assumption when it concluded that Congress had not intended to abrogate sovereign immunity. Only by concluding that Congress had not intended to abrogate sovereign immunity did the Fifth Circuit find that federal courts did not have jurisdiction. After *Torres*, however, courts cannot make this assumption anymore. *Torres* dictates that States are not afforded, and never have been

---

[3] The Court notes that this holding is in line with the two other district courts in this Circuit that have addressed the issue of whether, after *Torres*, the Fifth Circuit's ruling in *McIntosh* still requires dismissal of these types of USERRA claims. *See Fuentes v. Texas Dep't of Crim. Just.*, No. 7:22-CV-00038-O, 2023 WL 5004145 (N.D. Tex. Aug. 4, 2023) (dismissing USERRA claim against the State for lack of jurisdiction); *see also Trimble v. Louisiana State Univ. Sys.*, No. CV 22-351-SDD-RLB, 2023 WL 1808355 (M.D. La. Jan. 4, 2023), *report and recommendation adopted*, No. CV 22-351-SDD-RLB, 2023 WL 1802405 (M.D. La. Feb. 7, 2023) (same).

afforded, sovereign immunity against USERRA claims. Plaintiff is fair, then, to ask the question: how does removing sovereign immunity from the equation impact the rest of *McIntosh*'s reasoning? Does jurisdiction still lie exclusively in state courts, despite the fact that the statute says "may" instead of "must"?

While these are fair questions to ask, it is too attenuated a leap for the Court to depart from binding precedent in *McIntosh* and the language in *Torres* that is directly on point. The implications of *Torres* on sovereign immunity jurisprudence are still to be determined.[4] For now, however, precedent requires the Court to refrain from exercising jurisdiction over these types of claims.

## IV. Conclusion

For the reasons above, the Court finds that it lacks jurisdiction to hear Plaintiff's USERRA claim in light of the Fifth Circuit's decision in *McIntosh* and Supreme Court's language in *Torres*. Consequently, Defendant's Partial Motion to Dismiss for lack of jurisdiction is GRANTED. (Doc. No. 9). Plaintiff's claim for retaliation under Title VII remains live in this lawsuit and is unaffected by this Order.

Signed this 24th day of May 2024.

Andrew S. Hanen
United States District Judge

---

[4] The Court cannot intuit how this law, or others, will be impacted by *Torres* and the plan-of-the-Convention theory. Clearly, some of justices at the Supreme Court have recognized the lack of clarity in the recent decisions in this area. In her concurring opinion, Justice Kagan put it best: "In my view, our sovereign immunity decisions have not followed a straight line." *Torres*, 597 U.S. at 599 (Kagan J., concurring).