United States District Court
Southern District of Texas
**ENTERED**
January 03, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DR. JOSEPH URA, | § | |
| *Plaintiff,* | § § § | |
| V. | § § | CIVIL ACTION NO. 4:23-cv-2934 |
| TEXAS A&M UNIVERSITY, | § § § | |
| *Defendant.* | § § § | |

## ORDER

Pending before the Court is Defendant Texas A&M University's ("Defendant" or "TAMU") Motion for Summary Judgment. (Doc. No. 24). Plaintiff Dr. Joseph Ura ("Plaintiff" or "Dr. Ura") filed a response (Doc. No. 26) and TAMU replied. (Doc. No. 27). After considering the applicable law, briefs, and evidence, the Court hereby **DENIES** Defendant's Motion for Summary Judgment. (Doc. No. 24).

## I.  Background

This is an employment retaliation suit. Dr. Ura joined TAMU as Assistant Professor of Political Science in 2007.[1] (Doc. No. 1 at 3). He was promoted to Associate Professor with tenure in 2013 and began an appointment with Texas A&M University Qatar Campus ("TAMU-Q") in 2019. (*Id.*). On January 1, 2020, Dr. Ura became the Interim Liberal Arts Program Chair for TAMU-Q. His four-year appointment became fully effective on September 1, 2021. (*Id.* at 4). Dr. Ura recruited Dr. Sheela Athreya ("Dr. Athreya"), an Associate Professor of Anthropology with tenure at TAMU, to the faculty of TAMU-Q for a two-year appointment beginning in 2020. (*Id.*).

---

[1] Since the majority of the facts are not in dispute, the Court refers to the pleadings or Motion where applicable for background and context.

1

The contract between TAMU and the Qatar Foundation requires the school to make its best effort to recruit faculty from the TAMU's primary campus in College Station, Texas, with the target of staffing half of TAMU-Q's faculty positions with faculty from TAMU's College Station campus. TAMU-Q faculty positions for tenured faculty from the main campus are renewable by the Dean of TAMU-Q, Dr. Cesar Malavé ("Dean Malavé"). (*Id.*). Prior to the incidents made the basis of this case, no professor who requested an extended appointment at TAMU-Q with the support of their home department had ever been denied a renewal. (*Id.* at 5).

In June 2021, Dr. Ura spoke with the Head of the Department of Anthropology and the Dean of the College of Liberal Arts, Dr. Athreya's home departments. They unanimously supported extending Dr. Athreya's appointment at TAMU-Q. (*Id.*). On August 12, 2021, Dr. Ura requested that Dean Malavé renew Dr. Athreya's contract for two years. (*Id.*). Dean Malavé refused. (*Id.*). At this time, Dr. Ura began to suspect that Dean Malavé's justification and action may be connected to the absence of women among the senior faculty of TAMU-Q. (*Id.*).

On September 1, 2021, Dr. Ura requested that Dean Malavé renew Dr. Athreya's contract again, and Dean Malavé refused again. (*Id.*). At this same meeting, Dean Malavé instructed Dr. Ura to issue a non-renewal notice to Dr. Brittany Bounds ("Dr. Bounds"). Dr. Bounds was an Instructional Assistant Professor of History at TAMU-Q and co-chair of the TAMU-Q Women's Faculty Forum, a professional organization that advocates for greater inclusion of women in campus leadership roles and stronger efforts to recruit women to TAMU-Q's Faculty. (*Id.*).

Dean Malavé's actions against Dr. Athreya and Dr. Bounds contributed to Dr. Ura's suspicion that Dean Malavé was discriminating against these faculty because of their sex. (*Id.* at 7). On September 13, 2021, Dr. Ura discussed these suspicions over videoconference with Dr. Ioannis Economou ("Dr. Economou"), the Associate Dean for Academic Affairs at TAMU-Q at

the time, and Mario Rojo del Busto ("del Busto"), the Associate Dean for Faculties at TAMU. (*Id.*). At the meeting, del Busto indicated that Dean Malavé was pursuing Dr. Bounds' removal because of student complaints against her for her public comments and prior military service. (*Id.*). Dr. Ura told del Busto and Dr. Economou that he would not issue a non-renewal notice to Dr. Bounds until he had investigated the complaints against her. (*Id.*). Dr. Economou reported Dr. Ura's actions to Dean Malavé. (*Id.*). Dr. Ura refused to issue a notice of non-renewal to Dr. Bounds, insisting on an inquiry into the student complaints.

On September 16, 2021, Dr. Ura discussed his concerns with the then-Dean of Faculties, Dr. Blanca Lupiani ("Dr. Lupiani"). (*Id.* at 9). Dr. Ura stated in this meeting that he believed Dean Malavé was discriminating against Dr. Athreya and Dr. Bounds based on their sex and against Dr. Bounds due to her veteran status. (*Id.*). At the meeting Dr. Lupiani discussed concerns by the prior Arts Program Chair about potential discrimination by Dean Malavé. (*Id.*). Dr. Ura gave permission for Dr. Lupiani to discuss his concerns directly with Dean Malavé. (*Id.*). Six days later, Dr. Lupiani left her position as Dean of Faculties. (*Id.*).

On September 27, 2021, Dr. Ura reported his concerns about Dean Malavé's alleged discriminatory behavior to the TAMU Office of Ethics and Compliance (*Id.*). On October 18, 2021, Dean Malavé called Dr. Ura to his office and requested that Dr. Ura resign as Program Chair (*Id.* at 11). When seeking more details for the reason of this request, Dean Malavé identified three concerns: (1) that Dr. Ura had insisted on assigning teachers their normal course load unless they received extra compensation for additional classes; (2) that Dr. Ura asked the Dean of Faculties about the scope of Dean Malavé's ability to assign course load; and (3) that Dr. Ura started "the

3

investigation with Brittany [Bounds]".[2] (*Id.* at 12). Dr. Ura refused to resign, and Dean Malavé removed him from his position as Director on October 19, 2021.

Plaintiff asserts claims of retaliation under Title VII of the Civil Rights Act and the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). The Court granted Defendant's partial motion to dismiss Plaintiff's USERRA claim. (Doc. No. 17). Plaintiff's sole remaining cause of action is his claim of retaliation under Title VII. Plaintiff alleges that he was retaliated against for engaging in protected activity by reporting sex discrimination against his female coworkers. Defendant now moves for summary judgment on Plaintiff's Title VII retaliation claims, stating that Plaintiff's claim fails as a matter of law because Plaintiff cannot establish a prima facie case, Defendant had a legitimate, non-retaliatory reason for removing Plaintiff from his position, and Plaintiff cannot satisfy the but-for causation standard to prove that Defendant's proffered reasons are merely pretext.

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact

---

[2] There is conflicting evidence as to whether Dean Malavé mentioned Dr. Bounds in the October 18, 2021 meeting. (Doc. No. 26-3 at 8); (Doc. No. 26-5 at 3–4).

4

is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III.   Analysis

In *McDonnell Douglas*, the Supreme Court outlined a three-part framework to analyze a Title VII claim. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of retaliation. *Id.* To establish actionable retaliation under Title VII a plaintiff must first make a *prima facie* showing that: 1) he engaged in a protected activity; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012).

If the plaintiff establishes a *prima facia* case, the burden then shifts to the employer to demonstrate a legitimate, non-discriminatory purpose for the employment action. *Hernandez*, 670 F.3d at 657. If the employer does so, the plaintiff, in order to survive summary judgment, must raise a genuine issue of material fact as to whether the employer's stated reason for the adverse action was merely a pretext for the real purpose. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). This is accomplished by showing "that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d

450, 454 (5th Cir. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). To avoid summary judgment, the plaintiff must show "a conflict in substantial evidence on the question of whether the employer would not have taken the action but for the protected activity."[3] *Feist*, 730 F.3d at 454. In determining whether an adverse action was taken as a result of retaliation, the "focus is on the final decisionmaker." *Gee*, 289 F.3d at 346.

### A. Plaintiff's prima facie case

Defendant argues that Dr. Ura has failed to establish a *prima facia* case of retaliation because he has not alleged "materially adverse actions that would reasonably dissuade an employee from making or supporting a charge of discrimination," nor can he establish a causal link between the protected activity and alleged retaliatory action. The parties seemingly agree that Dr. Ura has satisfied the first element—that he engaged in a protected activity. Thus, the Court will address the second and third elements.

#### i. Adverse employment action

The second element of Plaintiff's *prima facie* case requires Plaintiff to provide sufficient evidence that an adverse employment action occurred. The adverse employment action must be material because "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006). Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded

---

[3] The Fifth Circuit has explained the distinction between the ultimate issue in a retaliation case—whether the defendant discriminated against the plaintiff because the plaintiff engaged in conduct protected by Title VII—and the third element of a plaintiff's prima facie case. *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996). The standards of proof differ. "The standard for establishing the 'causal link' element of the plaintiff's prima facie case is much less stringent" than the ultimate determination because the "plaintiff need not prove that their protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'casual link' element of a prima facia case." *Id.* On the other hand, the ultimate determination of whether the defendant discriminated against the plaintiff because the plaintiff engaged in conduct protected by Title VII requires a showing that the plaintiff would not have faced termination 'but-for' their engaging in the protected activity. *Id.*

6

a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotations omitted).

TAMU focuses its argument on the restructuring of the TAMU-Qatar program. Defendant argues that the reorganization of the department of which he was a member cannot constitute a materially adverse employment action. (Doc. No. 24 at 15). Conversely, Plaintiff expressly waives any alleged argument that the restructuring is his adverse employment action. (Doc. No. 26 at 11) (Plaintiff "unequivocally asserts that his termination as program chair was a materially adverse action taken against him"). Defendant subsequently agrees that this removal is the only adverse action at issue. (Doc. No. 27 at 6). Removal from a leadership position surely might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Thus, Plaintiff has provided sufficient evidence to satisfy this element of Plaintiff's *prima facie* case.

### ii. Causal link between the protected activity and the adverse action.

The third, and final, element of Plaintiff's *prima facia* case requires Plaintiff to make a showing that a causal link existed between the protected activity and the adverse action. A "causal link" may be shown by evidence that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Public Facility Management, Inc.*, 179 F.3d 164, 168 (5th Cir. 1999).

Defendant claims that Dean Malavé did not have any knowledge of Dr. Ura's protected activity when Dean Malavé removed Dr. Ura as Program Chair. Dean Malavé's affidavit and

7

deposition testimony reflect that he did not learn of the protected activity until November 2021. (Doc. No. 24-1 at 4); (Doc. No. 24-3 at 12–13). If true, that would establish a defense to this claim. *See Chaney*, 179 F.3d at 168.

Plaintiff, however, alleges that Dean Malavé had knowledge of his protected activity before his termination. Plaintiff purports to have engaged in protected activity four times prior to his termination as Program Chair on October 19, 2021, the first of which on August 30, 2021, and the last on September 27, 2021. As noted above, Dr. Ura met with Dean Malavé on October 18, 2021. During this meeting, Plaintiff swears that Dean Malavé told him to resign because he "started the investigation with Brittany [Bounds]." (Doc. No. 26-3 at 8). Dean Malavé denies making that statement. (Doc. No. 26-5 at 3–4). Defendant also states, without admitting, that even if Dean Malavé did make that statement, it does not constitute sufficient evidence that Dean Malavé had knowledge of the protected activity before Dr. Ura's removal because: 1) Dr. Ura claims that Dean Malavé referred to an "investigation," which could only refer to Dr. Ura's investigation of student complaints against Dr. Bounds, not Dr. Ura's September 27, 2021 complaint to TAMU's Office of Ethics and Compliance; 2) it is only Dr. Ura's subjective belief that Dean Malavé could have been referring to his September 27, 2021 complaint; and 3) Dr. Ura's September 27, 2021 complaint was not only an "investigation with Brittany" because there were two other individuals involved, so it is "nonsensical to maintain that [Dean] Malavé could have referred to a complaint concerning three people when the alleged statement characterized it as an investigation concerning only one of those individuals." (Doc. No. 27 at 9).

While Defendant is free to dispute Plaintiff's evidence, and it may ultimately prevail, Plaintiff has met his burden to produce sufficient evidence to raise a genuine issue of material fact as to whether Dean Malavé had knowledge of Dr. Ura's protected activity before his termination.[4]

### B. Defendant's legitimate, non-discriminatory purpose

Once the plaintiff has stated a *prima facie* case, the defendant must "articulate some legitimate nondiscriminatory reason" for its action that adversely affected the employee. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981). While an employer need not prove the legitimate reason, it must produce some evidence to support it. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993). If the employer produces any evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," then the employer has satisfied its burden of production. *Id.*

Defendant asserts that its legitimate, non-discriminatory purpose for terminating Dr. Ura was that "Dr. Ura's vision for the Liberal Arts Program was not aligned with Dean Malavé's vision for the program and its place within the university, and therefore his leadership was no longer needed." (Doc. No. 24 at 18). Further, Dean Malavé states that Dr. Ura was "openly antagonistic" to his leadership by mocking him in front of other faculty members and refusing to implement policy. (Doc. No. 24-1 at 3–4 ). "The sum of these experiences," Defendant concludes, is what led to Dr. Ura's termination, not his protected activity. (Doc. No. 24 at 18).

---

[4] Defendant also argues that "even if Ura could show that Malave was referencing his protected conduct, at most it would show that *one of* Malave's reasons for asking Ura to resign was his protected activity. That showing would not satisfy the 'but-for' standard." (Doc. No. 27 at 11) (emphasis in original). Defendant, however, conflates the standards of proof required to satisfy this element of Plaintiff's *prima facie* case. *See Long v. Eastfield Coll.,* 88 F.3d 300, 305 n.4 (5th Cir. 1996). Also, Defendant's reliance of *Owens v. Circassia Pharmaceuticals* is misplaced, as the Fifth Circuit's mention that the "third step" requires but-for causation actually refers to the third step of the *McDonnel Douglas* framework, not the third element of the prima facie case. *See Owens v. Circassia Pharms., Inc.,* 33 F.4th 814, 835 (5th Cir. 2022).

On the other hand, Plaintiff provides evidence that this is not a legitimate reason, but instead a *post hoc* justification created only to cover the allegedly illegal termination. Still, Defendant need not persuade the Court that its reason for terminating Dr. Ura is true. Defendant need only produce sufficient evidence that would allow a reasonable fact finder that it is true. Defendant has done so. Therefore, the burden then shifts to Plaintiff in the third step of the *McDonnel Douglas* framework.

### C. Plaintiff's burden to raise a genuine issue of material fact as to pretext

"Defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question:" whether Plaintiff would not have faced termination 'but-for' his engaging in the protected activity. *St. Mary's Honor Ctr*, 509 U.S. at 511. "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020), *as revised* (Aug. 14, 2020). Dr. Ura relies on the following evidence to demonstrate but-for causation: (1) the temporal proximity between his protected activity and his termination; (2) Dr. Ura's performance in the department was described as "close to heaven" a few months before he was terminated; and (3) Dean Malavé's alleged concern with Dr. Ura's "lack of support" of his vision for the program was constructed after Dean Malavé refused to renew the female professor's contract contrary to Dr. Ura's request.

The temporal proximity between Dr. Ura's protected activity and his termination is "relevant to, but not alone sufficient to demonstrate, pretext." *Id.* at 579 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)). Therefore, we must consider whether Dr. Ura's other evidence, in combination with this temporal proximity, is sufficient for a reasonable jury to find but-for causation.

10

Dr. Economou, the Associate Dean for Academic Affairs at TAMU-Q, wrote to Dr. Ura in an email stating, "[t]o be honest, the [Liberal Arts] program is close to heaven under your leadership." (Doc. No. 26-15 at 2). Dr. Ura contends that, because his leadership was described as "close to heaven," Defendant's proffered reason is simply pretext. Although the Fifth Circuit has found that a jury could find pretext if an employer justifies an adverse action on poor performance and there is evidence of good performance, Defendant states that "it was not his performance (except insofar as he was not aligned in vision with [Dean] Malave) or disciplinary history that led to his removal. It was his lack of support for [Dean] Malave's vision." *See Rikabi v. Nicholson*, 262 F. App'x 608, 611 (5th Cir. 2008); (Doc. No. 27 at 11). Since Defendant does not assert that it terminated Dr. Ura based on his performance, the Court will not consider Dr. Ura's performance reviews as evidence of pretext.

Nevertheless, there is sufficient evidence to raise a fact issue concerning pretext because all the instances of alleged "lack of support" for Dean Malavé's vision occurred after August 11, 2021.[5] (Doc. No. 26-13 at 3). While Dr. Ura focuses on evidence suggesting that he did support Dean Malavé's vision after August 11, 2021, the Court finds circumstantial evidence of pretext in that all instances cited by Defendant occurred after Dr. Ura's first protected activity on August 30, 2021. Dean Malavé's sworn affidavit states that Dr. Ura "mocked and ridiculed me in several meetings in September 2021," and in October 2021, Dr. Ura "refused to [return to in-person teaching] and claimed I had no authority to make this decision." (Doc. No. 24-1 at 3–4). The Court has not been provided with any evidence of any instance of "lack of support" that occurred before Dr. Ura engaged in a protected activity.

---

[5] As noted above, on August 12, 2021, Dean Malavé denied Dr. Ura's request to renew a female professor's contract term—an apparently unprecedented denial.

11

Therefore, the totality of the circumstantial evidence, including the timing of the instances allegedly indicating lack of support of Dean Malavé and the temporal proximity between Dr. Ura's termination and his protected activity, is sufficient for Plaintiff to meet his burden to raise a genuine issue of material fact as to whether a reasonable jury could find but-for causation. *See Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 298 (5th Cir. 2024) (finding that evidence of an "insubordinate attitude" only after the plaintiff engaged in protected activity was evidence to support a jury's finding of pretext).

## IV. Conclusion

After analyzing all three steps of the *McDonnell Douglas* framework, the Court finds that Plaintiff has raised an issue of material fact sufficient to meet his burden on summary judgment. For the reasons above, the Court hereby DENIES Defendant's Motion for Summary Judgment. (Doc. No. 24).

SIGNED at this 3 day of January, 2025.

Andrew S. Hanen
United States District Judge